Argued February 2; reversed February 16; rehearing denied
April 20, 1943

# CROSBY *v.* BRALEY & GRAHAM, INC., ET AL.

(134 P. (2d) 110)

Before BAILEY, Chief Justice, and BELT, ROSSMAN,
KELLY and HAY, Associate Justices.

*Arthur S. Vosburg,* of Portland (Reynolds, Flegel & Smith, of Portland, on the brief), for appellant.

*Robert T. Mautz,* of Portland (Wilbur, Beckett, Howell & Oppenheimer and Wendell Gray, all of Portland, on the brief), for respondent.

KELLY, J. As we view this record, the decisive question is whether the record discloses evidence tending to show that at the time of the accident, defendant, Handel, was acting within the course and scope of his employment as an employee of defendant Braley & Graham, Inc.

The accident occurred on the evening of December 17, 1940, in Portland, Oregon, at the intersection of Southeast Washington Street, and Southeast Union Avenue. Defendant, Handel, was the owner of the automobile which he was then driving.

The specific acts of negligence charged are failure to yield right of way, to keep a proper or any lookout, and to keep the automobile under proper or any control, operating said vehicle at a high, dangerous and reckless rate of speed under the circumstances, failure to sound horn or give any other signal or warning, failure to pass to the right of the center line of Southeast Union Avenue when making the left turn at said intersection, and, further, to pass to the right of the center line of Southeast Washington Street when entering said street from Southeast Union Avenue, and in operating said vehicle on the north half of Southeast Washington Street while proceeding in a general easterly or southeasterly direction. The negligence thus charged embraced only the allegedly negligent operation of his automobile by defendant Handel.

The only testimony dealing with the relationship between the defendant Braley & Graham, Inc., and

defendant Handel was given by defendant Handel when called first as a witness for plaintiff and later as a witness for himself.

Handel testified that at the time plaintiff was injured on December 17, 1940, Braley & Graham, Inc., maintained premises devoted to the sale of second-hand automobiles, commonly referred to as a used-car lot, located on the southwest corner of Southeast Grand Avenue and Southeast Washington Street in the city of Portland, Oregon. This used-car lot had a frontage of 100 feet on both Southeast Grand Avenue and Southeast Washington Street with a drive-in entrance on each street. This used-car lot had an office building located thereon, was illuminated by floodlights at night, and the entrances to the lot were guarded by chains suspended between posts. The only cars sold from this lot were second-hand cars owned by Braley & Graham, Inc., which were also stored on the lot.

Three salesmen were employed by Braley & Graham, Inc., in connection with the sale of used cars from this lot, including Handel. Handel received no regular salary from Braley & Graham, Inc., for his services and his compensation was wholly dependent on commission that he might earn in selling used cars for Braley & Graham, Inc.

It was the practice of Braley & Graham, Inc., to have the salesmen connected with this used-car lot on duty at the lot at specified times. The lot was commonly kept open until 9 p. m. but occasionally it was kept open after this hour if there was a good prospect there. At closing time at night the salesman in charge of the lot was instructed by Braley & Graham, Inc., to lock all the cars on the lot, put the keys of these cars inside the office building, lock the office building, turn

off the floodlights and stretch the chains across the two entrances.

A salesman when on duty took care of all prospects who came upon the lot, made necessary demonstrations of the cars to prospective customers, and drove cars kept for sale on the lot to make calls on prospective customers. Occasionally if there was a shortage of cars at a particular time the salesman might use his own personal car to call on a prospect.

When open for business, one of the salesmen was in charge of the lot and, during the time he was in charge, he was supposed to remain there.

When a salesman was not on duty, he could use his time in any way that he saw fit. He could use this time for recreation, or he might call on prospective customers.

At the time of this accident, Handel owned an automobile which was the automobile Handel was driving at the time plaintiff was injured. This automobile had been purchased by Handel at the request of Braley & Graham, Inc., in order that he would not drive any of the cars owned by Braley & Graham, Inc., and stored on the used-car lot, except to demonstrate them to prospective purchasers.

Handel used his personal car in going to and from work, in hunting up prospects while not on duty, for the convenience of his friends and generally in the manner in which any ordinary person would use his own personal automobile.

Braley & Graham, Inc., had no interest in how Handel got to or from the used-car lot so long as he did not use any of its automobiles kept for sale on the used-car lot, nor the method Handel used in calling on prospective customers. He could walk, ride on a

bus, or use an automobile. Since Handel's remuneration was based entirely on commissions earned on the sale of used automobiles, he occasionally called on prospective customers outside his regular hours of duty at the used-car lot and in making these calls used his own automobile for his convenience, but this was not required by Braley & Graham, Inc.

Braley & Graham, Inc., had no control, either actual or potential, over Handel while he was driving his personal automobile, bore no part of the cost of upkeep of this automobile, did not furnish Handel with any gasoline or oil, and made no allowance for mileage when Handel used his car in looking up prospects.

The day this accident occurred, Handel came on duty at 8:30 in the morning, remained on duty until approximately 6 p. m. From 6 p. m. until the used-car lot was closed, Handel was the only salesman on duty and was in charge of this used-car lot.

During the evening while Handel was in charge of this lot a deaf and dumb boy, who was employed by Braley & Graham, Inc., during the daytime to clean automobiles, came to the used-car lot to see Handel. This visit had nothing to do with the operations on the used-car lot and was purely of a social nature.

At approximately 9 p. m. Handel, being in charge of the used-car lot, performed the usual duties incident to closing the used-car lot and then as a personal favor used his own automobile to drive this deaf and dumb friend to a club on the "West Side" of Portland where such unfortunate people congregate. Handel lived at 5116 Northeast Oregon Street, which is in a northeasterly direction from the used-car lot, and, on closing, Handel commonly would go north on Southeast Grand Avenue to East Burnside Street and then east on East

Burnside Street towards his home. In order to take his friend to the West Side Handel went west on Southeast Washington Street to Southeast Union Avenue, thence north on Southeast Union Avenue to East Burnside Street, and then west across the Burnside bridge to the West Side.

After depositing his friend at his club, Handel started to recross the Burnside bridge intending to continue directly east on East Burnside Street towards his home. While crossing this bridge, Handel remembered that at the time he had closed the used-car lot he had forgotten to lock a Ford automobile which he had been demonstrating, so when he reached the intersection of East Burnside and Union Avenue he turned south on Southeast Union Avenue, proceeded south on Southeast Union Avenue to Southeast Washington Street, and thence turned east on Southeast Washington Street towards the used-car lot.

The foregoing outline of the facts is taken from Handel's testimony, which, as we view it, disclosed that at the time of the accident Handel was on a mission personal to himself and only in the event of his return to the used-car lot, where his duty to lock a car there could be performed, could it be said that he was engaged in the furtherance of his codefendant's business.

As Handel turned east on Southeast Washington Street the plaintiff was struck by Handel's automobile. The plaintiff contended that Handel's automobile struck him when he was crossing Washington Street from the north to the south of the regular pedestrian lane, while Handel contended that the plaintiff was struck approximately 20 feet east of the regular pedestrian crossing. In any event, the accident occurred

before Handel had reached the Braley & Graham, Inc., used-car lot. Defendant Handel placed the time of the accident as between 9:15 and 9:30. Witness A. L. Bardsley, who testified for plaintiff, placed the time of the accident as after 9 p. m. Plaintiff testified that the accident occurred at 8:50 p. m., and that just before Handel's car struck him he noticed that the used-car lot was open for business because the flood lights were on. We find nothing other than the foregoing conflict as to the time when the accident occurred which tends to contradict or impeach defendant Handel as a witness herein.

Plaintiff argued that if the jury did not wish to believe Handel's testimony the jury would be warranted in finding that Handel was driving his car, which he had bought for use in appealing defendant's business at appealing defendant's direction, to the car lot of appealing defendant which at the time was open for business; he was on duty for said defendant at the time; he was returning from contacting a prospective customer, or from appraising a car to be turned in on a sale, or he had taken another employer or even an official of said defendant to one of its other locations; in short, he was engaged in furtherance of his codefendant's business and was doing the very thing for which he was employed.

In support of the foregoing argument, plaintiff calls attention to the fact that the jury rejected Handel's version of the accident.

■ We know of no rule of law which justifies a jury in basing its findings upon conjecture, surmise or imagination. If in the particulars, at variance with Handel's testimony, outlined by plaintiff's argument, as above repeated, the jury were influenced or moti-

vated it is obvious that they acted only upon conjecture, surmise or imagination.

As to the rejection of Handel's version of the accident, if his had been the only account of it, the jury could not have properly found against him; but plaintiff himself testified and witness Bardsley also testified upon that phase of the case.

An answer verified by Handel was offered by plaintiff but rejected by the court. During the discussion as to the admissibility of this pleading, plaintiff's counsel made this statement,—

"The purpose of my offer, if the court please, is not as impeaching evidence of the witness, because I don't think there is any conflict between the pleading and the witness' testimony."

■ It is obvious that when defendant Handel came on duty at the used-car lot at 6 o'clock p. m. of the evening plaintiff was injured, the relationship obtained of master and servant between defendant Braley & Graham, Inc., as master and defendant Handel as servant. It is equally apparent that when defendant Handel left the used-car lot on a mission of his own, such relationship was terminated.

This is not a case where the servant is sent over a given route by the master and instead of traveling, as directed, the servant deviates from the prescribed route for purposes of his own and later returns thereto. This is a case where the servant leaves his place of employment on a mission personal to himself, and is returning thereto when he meets with the accident in suit. The law seems to be quite well settled that until the servant arrives at the place where his duty is to be performed the relationship of master and servant is suspended and not in effect.

The duty which defendant Handel intended to perform could be accomplished only at the used-car lot. He intended to lock a used car which was upon the lot.

Plaintiff cites *Larkins v. Utah Copper Company*, 169 Or. 499, 127 P. 2d 354. The distinction between that case and the instant case is stated in the opinion thus:

"We are in accord with the general rule that an accident does not arise in the course of employment when it occurs while the employee is going to or from his place of work. Respondeat superior does not apply unless, at the time of the accident, the employee was acting within the scope of his employment or, as otherwise stated, was engaged in the furtherance of his master's business. The instant case is to be distinguished from those merely involving the application of the general rule, in that Harlow was directed to go to Bucoda to transact business for his employer; that the use of the automobile was impliedly authorized; that such method of transportation was reasonably necessary for the efficient prosecution of the company's business; that Harlow, the employee was subject to call at any time; and that it was his duty to return home and contact defendant company in order to be available for other inspection work."

The opinion in *Larkins v. Utah Copper Company*, supra, discloses that—

"The Utah Copper Company was engaged in the business of buying lumber from mills in western Oregon and Washington on a large scale—500 to 700 cars each year. It maintained an office in the city of Portland, in charge of Mr. Chatterton, its purchasing agent. It was the duty of the defendant Harlow, as it was of six other employees working out of the city, to inspect lumber purchased by the company, as it was loaded on the cars for ship-

ment. Harlow was subject to call at any time and, according to Mr. Chatterton, 'he could be sent any place we wanted to send him'. Harlow and the other inspectors always used their own automobiles in going to and from the place of inspection. After the lumber was inspected and Harlow returned to his home it was his duty to contact the office—usually by telephone—and to make out a written report of inspection. In the year 1940, Harlow worked 212 days inspecting lumber and was paid therefor the sum of $8 per day. Such rate of payment was made by the defendant regardless of the number of hours per day required to inspect the lumber. In addition to such payment, Harlow was allowed his hotel expense and railroad fare from Portland to place of inspection and return. This fare was, with the knowledge and consent of the defendant, applied by Harlow to the maintenance and upkeep of his automobile.

About 4 o'clock in the morning of February 9, 1940, Harlow pursuant to order of the defendant company, left his home at Milwaukie, a few miles south of the city of Portland, to go to Bucoda, Washington—8 miles north of Centralia—for the purpose of inspecting lumber. Harlow completed his inspection before noon of the same day and then drove to Hoquiam, about sixty miles distant, on a mission of his own. After transacting his business at Hoquiam, he started back to Centralia at about four o'clock in the afternoon and, upon arriving there, turned south on the Pacific highway, the direct route home. Harlow arrived at Portland at 7:30 at night—although it was 160 miles from Hoquiam—and proceeded slowly, as he says, south of Union Avenue.''

The accident occurred at the intersection of Halsey Street and Union Avenue.

It will be seen that Harlow deviated from the course necessary to be taken in the scope of his employment

when he drove to Hoquiam, but upon his return to Centralia, he resumed the direct route home. Except for the deviation mentioned Harlow was performing his duty to the Copper Company while driving to Bucoda and returning therefrom as well as while actively inspecting the lumber at Bucoda.

In the case at bar, Braley & Graham, Inc., had no control over the method, route or means by which Handel would come to his work or return from it, except that he was not permitted to use any car belonging to Braley & Graham, Inc.

In *Fogelson v. Jarman, et al,* 168 Or. 177, 121 P. 2d 924, the car driven by Homann was used in the business of defendants Jarman. Homann was a salesman of new and used automobiles and was allowed to use the car thus furnished by defendants Jarman in driving to and from his house and in work. At the time of the accident Homann was on his way to a sales meeting. In the instant case transportation of the employee to and from his work was not furnished by the employer. The employer had no interest in the car driven by the employee when the accident occurred.

In *Knapp v. Standard Oil Co.,* 156 Or. 564, 68 P. 2d 1052, defendant Hampton had been employed by defendant Standard Oil Company for 15 years and, for his services, was paid a monthly salary; that his duties were to promote the sales of Standard Oil products, call on customers and instruct other employees of the defendant company, who were selling its products on commission; that his territory consisted of parts of Grant and Harney counties and included the towns of Burns, Harney, Crane, Seneca, John Day and Prairie City; that in performing these duties, he had furnished his own automobile while

traveling on company business up to April, 1936, and had received compensation therefor from the company; that, since said time, the company had furnished him with an automobile to be used when traveling on company business; that he was supposed to work eight hours each day, but was subject to call whenever the same was necessary; that he, shortly prior to the accident, had changed his residence to Burns and was residing there at the time of the accident; that on Saturday, June 27, 1936, two days before the accident, while in Burns, he was directed by Mr. Vivian, a district sales manager of defendant company and one of his superior officers, to attend a meeting of its agents to be held on the following Monday in Pendleton, Oregon, for the purpose of promoting the sale of RPM motor oil, a new product that had been developed by the defendant company; that he left Burns on Sunday in his own automobile, taking his wife and two daughters, who were going to Walla Walla to visit; that he reached Pendleton on Sunday, attended the meeting on the following day and, at the close of the meeting, about 5 o'clock in the afternoon, he started back, traveling alone and carrying with him certain pamphlets and literature that had been delivered to him by the company; that he intended to reach John Day that night and stop over there for the purpose of transacting some business for the company on the following day; that, while so returning and before reaching John Day, the collision occurred. He also testified that Pendleton is about 200 miles from Burns, and 128 miles from John Day; that there was railroad service between Burns and Pendleton but that, after receiving the instructions to go to Pendleton, there was no train leaving Burns for Pendleton until the following

Monday morning and that, if he had taken it, he would have reached Pendleton too late for the meeting. His evidence also shows that the road he traveled in going to and from Pendleton was shorter than any other route he could have taken.

"He was paid a monthly wage and he was required to work eight hours per day and the locus of his employment was the territory where his duties were to be performed and this required that he should return to his territory and resume work on the following day." *Knapp v. Standard Oil Co.,* supra.

In the instant case, there was no direction to Handel to go from the used-car lot to any particular place, hence there could be no implied instruction that he should return. No arrangement was made either generally or specifically for the transportation to and from Handel's place of employment.

In *Wilson v. Steel Tank & Pipe Co.,* 152 Or. 386, 52 P. 2d 1120, George C. Dierking was the driver of the car involved in the collision resulting in plaintiff's injury. He was vice-president of defendant Steel Tank & Pipe Company of Oregon. He was also said company's shop superintendent and estimator and superintendent of the installation of sold equipment.

During the summer of 1933, the Steel Tank & Pipe Company obtained a contract for the installation of seventeen fermenting tanks at Vancouver, Washington, for the Star Brewing Company and other tanks were installed by them during October and November for that brewing company. These installations were supervised by Mr. Dierking.

On October 24, 1933, Dierking drove his own car to Vancouver to attend the opening of the brewery and

to see the plant in operation, but when he arrived they had closed down. After being at the brewery for about an hour during which time he went through the lower portion of the brewery plant, he left in his automobile and proceeded in a direct route toward Portland in the direction of the Steel Tank & Pipe Company's plant and also in the direction of his home which was beyond the plant. After leaving the interstate bridge and before reaching the plant, the collision in suit occurred. There were three cars owned by the Steel Tank & Pipe Company for the use of its officers and agents, and when Dierking used his own car for the company, it paid him mileage. These facts differ from those of the instant case. Handel was not an officer of Braley & Graham, Inc., he was not its shop superintendent and estimator, he had not supervised the installation of any device or instrumentality whatsoever for the Braley & Graham, Inc., and the Braley & Graham, Inc., did not pay him mileage for the use of his car or provide transportation for him.

*Johnson v. Steele,* 154 Or. 137, 59 P. 2d 237, discloses a contract between defendant Steele and The Texas Company, a California corporation, which the court construed as creating an agency on the part of defendant Steele for his codefendant, The Texas Company. When the accident occurred a Mr. Bewley and defendant Steele were driving a truck from which some oil barrels had been unloaded on one Mosteller's property. Mosteller was the operator of a filling station and as Steele was leaving, he assured Mosteller, "Whenever you are ready for my product, we are ready to go." Shortly thereafter, the truck collided with plaintiff's car.

The distinction between that case and the instant case is obvious. No solicitation by Handel of any prospective purchaser is shown. Handel simply left the place of his employment on a mission of his own and, before he had returned, the accident occurred.

In addition to the five Oregon cases which we have just discussed, plaintiff cites nine cases from other jurisdictions. The first of which is *Flood v. Bitzer,* 313 Ill. App. 359, 40 N. E. 557. The record of that case discloses that one Joseph Frerker was employed by defendants as a salesman of automobile parts and equipment. On Saturday, November 25, 1939, he had obtained an order for certain automobile parts from the Prefelt Company at Trenton, for delivery "Sunday sure". On Sunday, November 26, 1939, he picked up said parts at the place of business of defendants to deliver to defendants' customer at Trenton. He delivered some other parts at Meyers' filling station at Fairview. The accident occurred before he arrived at Trenton. Defendants paid him a monthly salary, paid him for his gas and oil and a certain amount each month for depreciation on his car amounting to about $25 a month. They also gave him an allowance for repairs.

In the instant case, Handel had no property of the Braley & Graham, Inc., to deliver and his means of transportation was not financed by said company. Besides he had no prescribed route upon which he was traveling when the accident occurred.

In *Modern Motors v. Elkins,* 189 Okla. 134, 113 P. 2d 969, defendant Ned Parry was in the employ of his codefendant Modern Motors Inc., a corporation, under a written memorandum of working agreement supplemented by the requirement that all salesmen were

required to report at a meeting in the office of the company at 8 o'clock each morning. At that time they held a short sales meeting and also at that time they turned in reports of work done the day before and outlined the work they were to do that day. The evidence also disclosed that salesmen were under the direction of the company to a certain extent and the sales manager outlined some of the work for salesmen to do during the day. The evidence was in conflict as to who owned the automobile that Parry was operating at the time of the accident. On the morning of the accident Parry left his home shortly before 8 o'clock to go either to the sales meeting at the office of the company or to interview prospective customers. In the instant case, there is no conflict as to the ownership of the car which was involved in the accident. No suggestion appears in the record that Handel was on his way to interview prospective customers.

*Richards v. Metropolitan Life Ins. Co.*, 19 Cal. 2d 236, 120 P. 2d 650, cited by plaintiff, discloses that at the time of the accident the defendant Lehman was and for sometime before had been in the employ of the defendant Metropolitan Life Insurance Company. His duties were the soliciting of insurance, the delivery of policies to policyholders, the collection of insurance premiums upon policies secured, the delivery of said premiums to the defendant company at its office in the city of Los Angeles and the attendance at daily meetings at the office of defendant company in the morning. On the morning of the accident Lehman was on his way to the office of the company to attend a meeting of the agents and to deliver premiums collected on the day previous. He went directly from his home and on his way to the office he met with the accident.

In the instant case, Handel had no money belonging to Braley & Graham, Inc., which he was carrying to the company's office when the accident occurred in which he was involved.

In *Nichols v. G. L. Hight Motor Co.*, 63 Ga. App. 166, 10 S. E. 2d 439, Johnson, the driver of the automobile which caused the death of plaintiff's son, was at the time employed as a salesman of the Hight Motor Company. That company furnished him with an automobile for the purpose of performing his duties. We find the following statement in the opinion:

> "The company had the right to direct the salesman to call upon any prospect. On the occasion of the death of plaintiff's son, Johnson was acting under the specific directions and instructions of the sales manager to call upon a particular prospect."

In the case at bar, when the accident occurred, Handel was not on his way to call upon a particular prospect as directed by Braley & Graham, Inc., and that company did not own or furnish the automobile which he was driving.

In *Wright v. Bridges,* 16 Tenn. App. 576, 65 S. W. 2d 265, the testimony was conflicting whether at the time of the accident, defendant automobile dealer's salesman was driving a new Nash automobile bearing a dealer's license plate or a Pontiac coach with a private car license plate. The court held that presented a question for the jury. No such conflict appears in the testimony of the case at bar.

In *Heintz v. Iowa Packing Co.*, 222 Iowa 517, 268 N. W. 607, there was a conflict in the testimony as to whether the packing company's car route salesman, Randolph, was assigned to routes 18 and 19 for the week of December 4th, or whether he had a special

assignment on the morning of December 7. The collision occurred after he had left Jefferson on the morning of December 7th sometime around 6 o'clock and was proceeding eastward. At the time of the accident, he was proceeding to Marshaltown, which was the headquarter's city route 19.

The testimony in the case of *Heintz v. Iowa Packing Company*, supra, disclosed that on several occasions prior to the accident, Randolph had used his own car in transacting business for the company; that he received compensation for the use of his car by way of an allowance of so much per mile; that in his expense report which he was required to make each week, the question was asked whether the car used was a company car or his own car, and in the expense accounts that he made out on various occasions he listed the fact that he had used his own car and asked mileage at the rate provided for by the company.

The duty resting upon Randolph as car route salesman conducting a soap campaign over designated route was widely different from the duty resting upon Handel to lock a used car upon the premises of the Braley & Graham company.

In *Elliason v. Western Coal & Coke Co.*, 162 Minn. 213, 202 N. W. 485, a truck driver hired by defendant Western Coal & Coke Co. had delivered coal for said defendant upon the day before the accident, and on the day of the accident was driving to the coal company's place of business to account for and deliver the money received by him for the coal so delivered.

We quote from the opinion:

"Our conclusion is based upon the special facts and circumstances of this case.

*We are not to be understood as holding* that by showing merely that plaintiff was injured by an employee of the defendant on his way to or from his place of work, the plaintiff is entitled to go to the jury. Something more than that is disclosed by the evidence in the instant case." *Elliason v. Western Coal & Coke Co.,* supra.

The foregoing quotation distinguishes that Minnesota case from the one at bar.

In *Pinnix v. Griffin, et al.,* 219 N. C. 35, 12 S. E. 2d 667, defendant Griffin was a whole-time employee of defendant, Gate City Life Insurance Company upon salary engaged in selling industrial insurance and collecting premiums in small amounts. In the afternoon of January 18, 1939, between 3 and 3:30 p. m. Griffin called at the home of a Mrs. Rogers on Jackson Street, of Greensboro, N. C., and asked for Mr. and Mrs. Otis Heath, who were described as "workers" who had recently moved in with the Rogers. He had in his hand an insurance collection book. He was traveling by auto which was his customary method of travel in his work as insurance solicitor and collector for his codefendant. The accident occurred about 3:30 p. m. at the intersection of West Market Street and Westover Terrace, which is west of Jackson Street. The court held that because Griffin was a whole-time employee on a salary, had appeared at the Rogers home on Jackson Street a few minutes before the accident with an insurance collection book in his hand, calling for certain workers who had recently moved in, and inasmuch as it was in the middle of the afternoon of what is ordinarily termed a working day, it would be a reasonable inference that he was at the time engaged in the duties of his employment, and that inference could not be defeated in the few minutes it took Griffin

to reach Westover Terrace still within his territory and run into the deceased.

The factual situation of the Pinnix-Griffin case is very different from the case at bar, but even in that case a strong dissenting opinion was rendered by Mr. Justice Barnhill in which Mr. Chief Justice Stacy and Mr. Justice Wineborne concurred.

We quote from *Auer v. Sinclair Refining Co.*, 103 N. J. L. 372, 137 A. 555, 54 A. L. R. 623:

"It is argued that the defendant MacLachlan was an independent contractor. We think he was not. It appeared that MacLachlan was employed by the Sinclair Refining Company to devote his whole time and best endeavors to the sale of the company's products to factories in a specified territory in New Jersey; that he was authorized to use in that work his own automobile; that the company paid him for the upkeep and running expenses of his car weekly upon production of required vouchers, besides his salary, which was paid every two weeks, and that the company retained control and directed the work by daily telephonic or written communications with him from its New York office. He was therefore a servant of the company and not an independent contractor, and the company was liable for the death of decedent sustained through his negligence in the performance of his duties. Lewis v. National Cash Register Co., 84 N. J. Law, 598, 87 A. 345.

It is further argued that at the time of the accident the defendant MacLachlan was not acting within the scope of his employment. But it is clear that he was. The decedent, a pedestrian, was hit and killed by MacLachlan's car while crossing a public highway in East Orange in this state. The accident occurred within the employer's territory, a few minutes after 6 p. m., at the end of his day's work, as he was driving from the point of his last call to the garage at his home where he kept his car."

From the foregoing quotation, it will be seen that in *Auer v. Sinclair Refining Co.,* supra, the company furnished the transportation for MacLachlan, retained control and directed his work by daily communications. In the instant case those facts are not present.

The question here presented has been fruitful of many cases. There are annotations thereon in 17 A. L. R. 621, 22 A. L. R. 1397, 29 A. L. R. 470, 45 A. L. R. 577, 50 A. L. R. 1450, 57 A. L. R. 739, 60 A. L. R. 1163, 87 A. L. R. 787, 107 A. L. R. 419 and 112 A. L. R. 920. This is stated merely to indicate the futility of attempting to review all the authorities of other jurisdictions. The writer has offered the foregoing review of the cases cited by plaintiff because of the urgent insistence of plaintiff's counsel that they sustain his contention that defendant Braley & Graham, Inc., was and is liable for its codefendant's tort. With this contention, as stated, the writer is unable to agree.

The judgment rendered by the circuit court is reversed as to appealing defendant, Braley & Graham, Inc., and this cause is remanded to said circuit court with instructions to enter an order of dismissal as to said appealing defendant.